IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
August 6, 2019 Session

**MATEEM HUDSON v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 10-05221        Chris Craft, Judge**

_____

**No. W2018-01939-CCA-R3-PC**
_____

The Petitioner, Mateem Hudson, appeals the Shelby County Criminal Court's denial of his petition for post-conviction relief from his conviction of second degree murder and resulting sentence of twenty-three years in confinement. On appeal, the Petitioner contends that he received the ineffective assistance of trial counsel. Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and D. KELLY THOMAS, JR., JJ., joined.

Lance R. Chism (on appeal) and Mozella T. Ross (at hearing), Memphis, Tennessee, for the appellant, Mateem Hudson.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Leslie Byrd, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

This case relates to the death of eighteen-year-old Waijonel Desilva. The victim was a prostitute and worked the area of Lamar Avenue in Memphis. On the morning of December 14, 2008, she was run over by a tractor trailer truck and found lying on an exit ramp off Interstate 240. The Petitioner's trial began on April 23, 2012, and a Shelby County Criminal Court Jury convicted him of second degree murder as charged in the indictment.

At trial, Larico Nelson testified that he last saw the victim alive about 4:00 a.m. on December 14, 2008, when he dropped her off at the Mapco on Lamar Avenue near Pearson Road. State v. Mateem Hudson, No. W2012-01911-CCA-R3-CD, 2014 WL 296015, at *1 (Tenn. Crim. App. at Jackson, Jan. 28, 2014), perm. app. denied, (Tenn. May 14, 2014). The victim telephoned Mr. Nelson at 7:46 a.m., and he telephoned her at 8:13 a.m. Id. However, she did not answer. Id. Mr. Nelson denied being the victim's pimp and fighting with her at the Mapco on December 14. Id.

About 8:00 a.m., a motorist found the victim dead on the exit ramp from Interstate 240 onto Mt. Moriah Road. Id. Officer Francis Cherry of the Memphis Police Department (MPD) testified as an expert in accident reconstruction that he went to the scene and saw "'very pronounced'" skid marks on the exit ramp. Id. Moreover, the skid marks were from "'dual'" tires, were made by tires that were locked and no longer spinning, and came from the right side of a vehicle. Id. A second set of skid marks was made by dual tires from the left side of a vehicle, and the tires were "'skipping,' meaning the two tires were still rolling and trying to brake but were not locked." Id. The officer noted that tractor trailers had dual sets of rear tires. Id. The victim had various injuries, including "a 'crushing type' injury to her head," and a can of mace was "'just off her hand.'" Id. at *2, 3.

Carmond Taylor testified that she worked as a prostitute on Lamar Avenue on the night of December 13, 2008. About 8:00 a.m. the next morning, she got into the cab of the Petitioner's tractor trailer truck and agreed to engage in sex acts for sixty dollars. Id. at *3. The Petitioner ended up punching her in the face, ripping off her clothes, and duct-taping her wrists and ankles together. Id. Ms. Taylor said the Petitioner "'started talking about how he hated prostitutes and maybe this would help [her] to stop and all this." Id. The Petitioner later removed the duct tape, allowed Ms. Taylor to put her clothes back on, and allowed her to sit in the cab of the truck with him. Id. Ms. Taylor said he told her that "'you better not jump out [of] this truck because I'm going real fast, I'm going like a hundred miles an hour and if you [jump] out, it's going to kill you and nobody is going to know who did it to you.'" Id. When the Petitioner stopped at a truck stop and went inside, Ms. Taylor also went inside. Id. She had someone call the police, and she went to a hospital. Id. Ms. Taylor identified photographs for the jury showing duct tape residue on her ankles, arms, and neck. Id. On cross-examination, Ms. Taylor denied stealing money from the Petitioner. Id. at *4.

An officer from the Crossville Police Department (CPD) spoke with Ms. Taylor, who had a laceration on her lower lip, a cut across the bridge of her nose, and duct tape "'remnants'" on her lower legs. Id. The officer issued a be-on-the-lookout for a TransCarrier tractor trailer truck and gave a description of the driver, and an officer from

the Cumberland County Sheriff's Department stopped the Petitioner's truck on Interstate 40 at mile marker 336. Id. The truck was impounded, and CPD officers found blood, flesh, and hair on the passenger side of the trailer. Id. In addition, the trailer's rear passenger-side tires had "'flat spots,'" which an officer concluded had been caused by a sudden stop of the truck. Id. The biological material on the trailer turned out to be that of the victim. Id. at *6.

Lieutenant Barry Hanks of the MPD testified that on the morning of December 14, 2008, he spoke with Larico Nelson and looked at Mr. Nelson's car. Id. at *5. Mr. Nelson answered all of Lieutenant Hanks's questions. Id. Lieutenant Hanks did not find any biological material on Mr. Nelson's car or find any damage to the car and concluded that Mr. Nelson was not involved in the victim's death. Id. On April 20, 2009, Lieutenant Hanks spoke with the Petitioner. Id. The Petitioner said that on December 14, 2008, he drove his truck to the Mapco on Lamar Avenue to buy cigarettes. When asked about Carmond Taylor, the Petitioner said he told Ms. Taylor that he would run over her if she got out of the truck. Id. However, he denied being at the Mt. Moriah exit that day. Id. On cross-examination, Lieutenant Hanks testified that Mr. Nelson was a "'person of interest'" in the victim's death and that the Petitioner denied having any contact with the victim. Id. Lieutenant Hanks asked the Petitioner how the victim's biological material got on his truck, and the Petitioner said the police put it there. Id. at *6.

Timothy Smith testified that on April 8, 2012, he was in a jail cell beside the Petitioner and heard the Petitioner tell another inmate that he picked up a girl on Lamar Avenue, that he stopped at a store and went inside, and that the girl and his wallet were gone when he returned to his truck. Id. The Petitioner said that he found the girl back on the street, that he wanted to get his money back, and that he "'had to run that [bi***] over.'" Id. The next day, Mr. Smith made bond and contacted the district attorney's office. Id.

An agent from the Tennessee Bureau of Investigation (TBI) collected fingerprints from the exterior of the truck, but the fingerprints did not match the Petitioner, the victim, or Carmond Taylor. Id. The agent collected items from inside the cab of the truck, including a wad of duct tape and a roll of duct tape. Id. Two fingerprints on a plastic container on the bed in the cab's sleeping compartment matched Ms. Taylor, and the Petitioner's palm print was on the roll of duct tape. Id. The agent did not find the victim's fingerprints on any items. Id. The agent also vacuumed the interior of the cab to collect fiber evidence, but microscopic analysis of the fibers did not show a transfer of fibers between the victim and the truck. Id. DNA analysis of fingernail scrapings collected from the victim matched only the victim. Id.

- 3 -

Deputy James Porter, an employee of the Shelby County Jail, testified for the Petitioner that on the morning of April 9, 2012, the Petitioner left the jail and went to court. Id. at *7. While he was gone, Deputy Porter heard three inmates talking about the Petitioner's case and heard one of them say, "'[I]f you all want a time cut, just write the district attorney and sign on his case.'" Id. During the conversation, the door to Timothy Smith's cell was open, and Mr. Smith was standing in the doorway. Id. Deputy Porter said he never heard the Petitioner discuss his case with anyone. Id. On cross-examination, Deputy Porter acknowledged that a couple of cells separated Mr. Smith's and the Petitioner's cells. Id.

After the jury convicted the Petitioner of second degree murder, a Class B felony, the trial court sentenced him to twenty-three years to be served at one hundred percent. On direct appeal of his conviction, the Petitioner claimed that the trial court erred by allowing Carmond Taylor to testify about her interaction with him on December 14, 2008, because the evidence was inadmissible pursuant to Rule 404(b), Tennessee Rules of Evidence. Id. The trial court held a Rule 404(b) hearing in which Ms. Taylor testified about what happened in the Petitioner's truck on the morning of December 14. Id. During the hearing, she said the Petitioner told her that he hated prostitutes and that "'you better not jump out [of] this truck because I'm going fast and if you jump out, I'm going to kill you, I'm going to run you over, I'm not going to stop.'" Id.

This court affirmed the trial court's ruling that Ms. Taylor's testimony was admissible at trial to prove the Petitioner's intent and motive to kill the victim, explaining as follows:

Turning to the instant case, the State informed the jury during opening statements that the evidence would show that the appellant intentionally killed the victim and would show why he killed her. The State's case established that the appellant and the victim did not know each other until shortly before her death on December 14, 2008. Shortly after her death, the appellant picked up [Ms.] Taylor, another prostitute, physically assaulted her, and kidnapped her. He told [Ms.] Taylor that he hated prostitutes and that he would run over her if she jumped out of the truck. Meanwhile, the victim was found lying on the exit ramp with road rash and tire marks over her body. The right rear tires of a tractor trailer truck had run over her head. Through his cross-examination of the State's witnesses, defense counsel tried to infer to the jury that [Mr.] Nelson had been arguing with the victim before her death, that she was walking or standing on the exit ramp, and that a car struck her. Moreover, during closing arguments, defense counsel argued that [Mr.] Nelson was the last person to know the victim's whereabouts, that the victim "supposedly" got

- 4 -

into the appellant's truck, that she and the appellant argued, and that the victim jumped out. Counsel contended that the proof did not show that the tires of the appellant's truck ran over the victim and that "even playing devil's advocate," the proof did not show that he swerved to hit her. Counsel noted that the police did not find any forensic evidence linking the victim to the inside of the tractor and argued that she had never even been inside the truck. He then stated as follows:

> Identity is an issue here, ladies and gentlemen. And it's an issue because no one has identified Mr. Hudson as the driver of that vehicle prior to any time, okay, other than Carmond Taylor.
>
> She's the only one that identified him as the driver of that vehicle.

The appellant's identity as the driver of the truck, his motive to kill the victim, and his intent to kill her were paramount to the State's case. The appellant's telling [Ms.] Taylor that he hated prostitutes was highly relevant to show his motive for killing the victim. See [State v. Kiser, 284 S.W.3d 287, 291 (Tenn. 2009)] (concluding that defendant's general animosity toward police was relevant to the State's theory that he shot and killed police officer). Moreover, the appellant's telling [Ms.] Taylor that he would run over her if she jumped out of the truck and that no one would know he killed her was highly relevant to show he intentionally ran over the victim. Although the appellant claims that the State's use of [Ms.] Taylor's testimony to prove he intentionally killed the victim was excessive because the State alleged that he knowingly killed the victim, a finding that a defendant acted intentionally necessarily establishes that the defendant acted knowingly. See Tenn. Code Ann. § 39-11-301(a)(2). Therefore, the State's use of the evidence to prove that the appellant acted intentionally was logical trial strategy. Regarding [Ms.] Taylor's testimony to establish the appellant's identity as the driver of the truck, we agree with the trial court that [Ms.] Taylor's testimony was less material to the State's case because other evidence, such as the appellant's statement that he was the sole driver of the truck, established that fact. Nevertheless, the trial court properly ruled that [Ms.] Taylor's testimony was highly relevant to show the appellant's motive and intent.

Id. at * 10.

- 5 -

The Petitioner also claimed that the evidence was insufficient to support his conviction. Id. at *11. This court disagreed, explaining as follows:

Taken in the light most favorable to the State, the evidence shows that sometime between 7:45 a.m. and 8:15 a.m. on the morning of December 14, 2008, the appellant picked up the victim, a prostitute, at the Mapco on Lamar Avenue. Shortly thereafter, he either pushed her out of his truck or she jumped out to get away from him as he was exiting Interstate 240 onto Mt. Moriah Road. While the victim was lying on the exit ramp, the appellant ran over her with the rear tires of his tractor trailer, crushing her skull and causing other catastrophic injuries. The appellant did not attempt to help the victim. Instead, he returned to Lamar Avenue and picked up Carmond Taylor, also a prostitute. He physically assaulted [Ms.] Taylor, bound her with duct tape, and told her that he hated prostitutes. At some point, the appellant removed the duct tape and allowed [Ms.] Taylor to sit in the front of the truck with him. However, [Ms.] Taylor said he warned her that he would run over her if she jumped out, that he would not stop, and that no one would know he was responsible. While the appellant and Timothy Smith were in jail, [Mr.] Smith heard him say that he "had to run that [bi***] over." Based upon the evidence, a reasonable jury could have concluded that the appellant intentionally ran over the victim after she jumped out of his truck and was lying on the exit ramp.

Id. at *12.

After our supreme court denied the Petitioner's application for permission to appeal, he filed a timely petition for post-conviction relief, claiming that he received the ineffective assistance of trial counsel. Relevant to this appeal, the Petitioner asserted that trial counsel was ineffective because trial counsel never met with him in jail before trial; advised him not to attend the Rule 404(b) hearing so as to avoid being identified by Carmond Taylor even though the Petitioner wanted to testify at the hearing; advised him on the first day of trial that trial counsel's strategy was to shift the blame for the victim's death to Larico Nelson and argue that the victim was never in the Petitioner's truck when the Petitioner wanted to testify about how the victim died accidentally; and failed to hire an accident reconstructionist to show that the victim jumped from his truck and was hit on the "blind-side" of his trailer. The post-conviction court appointed counsel, and counsel filed two amended petitions.

At the outset of the evidentiary hearing, the State advised the post-conviction court that it had been unable to find trial counsel. The post-conviction court stated that it

would have a judicial assistant call the Board of Professional Responsibility to find out if the Board had an address for trial counsel, but trial counsel could not be located.

Steven Ashton testified for the Petitioner as an accident reconstruction expert that he reviewed evidence from this case, including the trial transcript, numerous photographs of the crime scene and the Petitioner's truck, and "five pages regarding the tractor and trailer." Mr. Ashton acknowledged that post-conviction counsel told him that the State's theory of the case was that the Petitioner may have pushed the victim out of his truck, which was a 2007 Peterbilt model 387, as the truck was turning right onto Mt. Moriah Road at the end of the exit ramp from Interstate 240. Mr. Ashton located a 2006 Peterbilt model 387 and took measurements of that truck. He then had his wife, who was about the same size as the victim, sit in the passenger seat of the cab. Mr. Ashton could not find anyone the same size as the Petitioner, who was 220 pounds and six feet, four inches tall, to sit in the driver's seat. Nevertheless, Mr. Ashton concluded that based on measurements inside the truck and the average wingspan of a male, it would have been "virtually impossible" for the Petitioner to have reached across the cab, opened the passenger door, and pushed the victim out as he was driving on the exit ramp. Mr. Ashton said that in order for the Petitioner to have pushed the victim out of the truck, the Petitioner would have had to have been standing, "which is literally impossible as you're driving a tractor trailer and coming off a ramp making a 420 degree radius right-hand turn." Therefore, in Mr. Ashton's opinion, the Petitioner did not push the victim out of the truck.

Mr. Ashton testified that as the Petitioner was turning right, "off tracking" was occurring, meaning that the trailer's rear tires were not traveling in the same path as the truck's front tires. Moreover, "[t]he slower the speed, the more off tracking there is." Based on Mr. Ashton's research of other cases involving off tracking, the off tracking on the Petitioner's truck could have been as much as nine feet at twenty-files miles per hour. If the victim jumped out of the truck as the Petitioner was turning right, the Petitioner had no control over where the rear wheels of the trailer were going, and "there's almost no doubt" that the trailer ran over the victim. Post-conviction counsel asked how the Petitioner could have run over the victim intentionally, and Mr. Ashton answered as follows:

> I don't believe [the Petitioner] had any control over the path that his tires were going to take. Again, he's going to take up, for the most part, most of that ramp as he's making a right-hand turn. He can go out as far as he wants to the left, but his right tires are still going to track inside the path of his front tires and cover the majority of that lane. So, I think as far as his intent to run over her, I don't think that there's any way possible to say that he intended to run over her.

- 7 -

Mr. Ashton said that even if the Petitioner was looking at his passenger-side mirror as he was turning right, he would have seen "primarily just the side of his trailer" and would have been unable to see the victim lying on the ground.

On cross-examination, Mr. Ashton testified that he recalled skid marks being on a diagram of the crime scene but that he did not recall the diagram's showing the length of the skid marks.[1] The skid marks indicated that the Petitioner's truck was slowing down. However, without knowing the length of the skid marks, Mr. Ashton could not say how much the truck slowed or determine the Petitioner's speed. He said that he reviewed the trial transcript but that he did not remember any testimony about the tires being locked and not spinning. He said he remembered "some mention of a gap skid," which could have meant that the truck's anti-lock braking system (ABS) was activated.

Mr. Ashton testified that the average male's wingspan was five feet, nine inches from fingertip to fingertip. Therefore, the average male would have been unable to reach beyond three feet without extending his body. Mr. Ashton acknowledged that the Petitioner would have been able to push the victim, who was sitting in the passenger seat, but said that the Petitioner would have been unable to open the passenger door. He said that if the victim opened the door, he did not know if the Petitioner could have pushed her out of the truck.

On redirect examination, Mr. Ashton testified that a commercial vehicle, such as a tractor trailer, made the skid marks on the diagram. He could not say, though, that the Petitioner's truck made the skid marks. He acknowledged that after the victim was out of the truck, "everything else was mechanical, that it was beyond [the Petitioner's] control."

The Petitioner testified that an attorney was appointed to represent him and that the attorney gave him discovery. The attorney developed a conflict, so the trial court appointed trial counsel. On the day of trial counsel's appointment, he and the Petitioner met in the back of the courtroom to discuss the Petitioner's case. However, their meeting was less than ten minutes, and the Petitioner did not get a chance to tell trial counsel his story. The Petitioner was in jail while awaiting trial, and trial counsel never visited him in jail. The Petitioner did not have trial counsel's telephone number or address, and they never communicated by telephone or mail. Trial counsel represented him for more than one year, but they did not go over discovery materials. The Petitioner said he not see trial counsel again until jury selection. The Petitioner wrote to the Board of Professional

---

[1] The diagram, which was prepared by a police officer on December 19, 2008, was introduced into evidence at the post-conviction hearing. A "narrative" on the diagram stated that "it appears another vehicle laid down 80 feet of skid marks approximately 80 feet away from the body point of impact" and that it was unknown whether the skid marks were related to the victim's death.

Responsibility twice. In the Petitioner's first letter, he complained that trial counsel had not talked with him about his case. The Petitioner never complained to the trial court about trial counsel.

The Petitioner acknowledged that on April 5, 2012, the trial court held a hearing pursuant to Tennessee Rule of Evidence 404(b) and that he met with trial counsel in the courtroom before the hearing. Trial counsel told the Petitioner that the Petitioner did not need to attend the hearing because the hearing was "just for identification purposes anyway and they got other means to identify you as the driver and you even said you was the driver of the tractor trailer, so you shouldn't be present." The Petitioner said he thought the hearing was going to be "like a line up or something" and did not know that the purpose of the hearing was so the State could show at trial that he intended to kill the victim and that her death was not a mistake or accident. He said that if trial counsel had told him Carmond Taylor was going to testify about the "whole event" on December 14, 2008, he would have attended the hearing.

The Petitioner testified that trial counsel "acted like he was shocked" and "didn't know what was going on" prior to the Rule 404(b) hearing and that trial counsel should have asked for a continuance. If trial counsel had asked for a continuance, the Petitioner could have told trial counsel what Taylor was going to say at the hearing. The Petitioner then would have told trial counsel "exactly" what he said to Ms. Taylor on December 14. The Petitioner would have told trial counsel that he asked Ms. Taylor, "[Y]ou ain't going to jump out this truck [are] you?" Ms. Taylor said no, so the Petitioner told her, "[W]e in a train of 18 wheelers going 65 miles per hour down the highway. 18 wheelers in front of me, 18 wheelers behind me, we in a train. . . . [Y]ou know if you jump out this truck you can get ran over."

The Petitioner testified that on the first day of trial, trial counsel told him that trial counsel was going to "shift the blame" to the victim's boyfriend, Larico Nelson. The Petitioner told trial counsel that he wanted to testify, and trial counsel responded, "Why would you place the girl in your vehicle if the State can't prove she was in your vehicle?" The Petitioner disagreed with trial counsel's strategy because the victim's DNA was on the Petitioner's trailer but was not on Mr. Nelson's car. Moreover, the proof established that a large truck ran over the victim. The Petitioner wanted to tell the jury that the victim's death was an accident and show the jury how she died. Therefore, trial counsel's strategy should have been that the victim's death was an accident. During jury selection, trial counsel kept telling the Petitioner that he would come to the jail to talk with the Petitioner about trial strategy, but trial counsel never did so.

The Petitioner testified that after he heard Timothy Smith testify at trial, he asked that trial counsel contact Deputy Porter. The Petitioner also asked that trial counsel

contact Mike Gabe, the Safety Instructor at TransCarrier, because Mr. Gabe knew that the right side of a tractor trailer truck was the driver's blind side and that a trailer "cuts in closer to the curb" when a truck made a right turn. Trial counsel had Deputy Porter testify but told the Petitioner that "nobody answered the phone" at TransCarrier. The Petitioner said that having an expert like Steven Ashton testify at trial would have been helpful to his case because another vehicle, not his truck, made the skid marks on the exit ramp. Moreover, an expert's testimony would have shown that the driver of a tractor trailer truck could see only the right side of the trailer when the driver made a right turn; the driver could not see the right rear tires or the ground.

On cross-examination, the Petitioner testified that after the trial court appointed trial counsel in the courtroom, the Petitioner did not see trial counsel again until the Petitioner came to the courtroom for the Rule 404(b) hearing. The Petitioner saw trial counsel for the third time at jury selection. During jury selection, the Petitioner learned that Timothy Smith was going to testify for the State. At that time, the Petitioner did not know Mr. Smith or anything about him. After Mr. Smith testified, the Petitioner asked that trial counsel have Deputy Porter testify, and trial counsel did so.

The Petitioner testified that the Board of Professional Responsibility did not give him any contact information for trial counsel. Trial counsel told the Petitioner that he did not want the Petitioner at the Rule 404(b) hearing because he did not want Carmond Taylor to identify the Petitioner as the driver of the truck. The Petitioner acknowledged that Ms. Taylor was the only person who could place him in the truck on the day of the victim's death. The Petitioner also acknowledged that trial counsel's strategy was to create doubt that a truck hit the victim and to show Larico Nelson had prior altercations with her. However, the victim's DNA on the Petitioner's trailer was a problem for the defense. The Petitioner said that he did not remember trial counsel's arguing that even if the Petitioner's truck hit the victim, the Petitioner did not intend to hit her.

The Petitioner testified that if he had heard Ms. Taylor's testimony at the Rule 404(b) hearing, he could have explained to trial counsel that he took Carmond Taylor "out of town" with him and duct taped her to keep her from attacking him while he was driving. The Petitioner "released" Ms. Taylor from the duct tape and allowed her to sit in the front of the cab with him. The Petitioner asked her if anything like this had ever happened to her before, and she told him that she had "been through worse than this." She then told him that a man had stabbed her in the chest and that she had jumped from his car while he was driving. The Petitioner asked her if she was going to jump from his truck.

The Petitioner testified that if trial counsel had asked for a continuance at the Rule 404(b) hearing, he could have helped trial counsel cross-examine Ms. Taylor. He

acknowledged that Ms. Taylor testified at trial in conformity with her statement to the police and that he was aware of her statement before the Rule 404(b) hearing. He also acknowledged that he wanted to testify at trial and that the State could have cross-examined him about "all of the things that happened with Ms. Taylor."

On redirect examination, the Petitioner testified that trial counsel was unprepared for the Rule 404(b) hearing and should have asked for a continuance so that trial counsel could have conferred with the Petitioner about Ms. Taylor's testimony and could have hired an investigator to investigate Ms. Taylor. Trial counsel then could have cross-examined Ms. Taylor about her December 14 conversation with the Petitioner and could have impeached her. Because the Petitioner was not at the hearing to rebut Ms. Taylor's testimony, the trial court heard only her version of the events.

In a written order, the post-conviction court denied the petition for post-conviction relief. As to the Petitioner's claim that trial counsel was ineffective because he failed to meet with the Petitioner in jail before trial, the post-conviction court found that the Petitioner's testimony that he did not speak with trial counsel from the time of trial counsel's appointment until jury selection was "completely without credibility" and "absolutely false." The post-conviction court "recall[ed] distinctly their consultation in court before and during the trial, and it seemed that they got along extremely well." The court noted that the Petitioner "complained extensively about many matters" at the sentencing hearing but that the Petitioner never complained about trial counsel. The post-conviction court further noted that "[t]his court . . . set the petitioner's case for ten separate court dates prior to trial, and set his trial on two separate trial settings" and that "[trial counsel] filed pretrial motions, had motion dates, and several report dates, and the petitioner was present for each date." Finally, the post-conviction court noted that the trial court held a Momon hearing at trial and that the Petitioner did not complain about trial counsel during the hearing. The post-conviction court found that, in any event, the Petitioner had failed to demonstrate prejudice "due to any alleged non-communication."

As to the Petitioner's claim that trial counsel was ineffective for advising him not to attend the Rule 404(b) hearing, the post-conviction court found that trial counsel and the Petitioner were aware of the hearing and that trial counsel was prepared for it. The post-conviction court recounted that on the day of the hearing, trial counsel filed a motion to waive the Petitioner's presence. During the hearing, trial counsel advised the trial court that he and the Petitioner did not want the Petitioner to be present because they did not want Carmond Taylor to identify the Petitioner. The trial court voir dired the Petitioner regarding his right to be present, and the Petitioner waived that right. The trial court found that the Petitioner failed to demonstrate the ineffective assistance of counsel.

- 11 -

Regarding the Petitioner's claim that trial counsel was ineffective because he advised the Petitioner not to testify at trial, the post-conviction court noted that the Petitioner testified at the sentencing hearing. During his testimony, the Petitioner claimed that the victim jumped from his truck after having stolen his wallet, that she was killed accidentally, and that he did not find out about her death until four months later. The post-conviction court found that the State "destroyed" the Petitioner on cross-examination and that trial counsel made a "wise" decision in advising the Petitioner not to testify at trial.

As to the Petitioner's claim that trial counsel was ineffective for failing to hire an accident reconstructionist, the post-conviction court found "several problem[s]" with Steven Ashton's opinions that the Petitioner would have been unable to open the passenger door while driving, that the Petitioner would have been unable to see his wheels or the ground while turning right, and that the Petitioner would have had no control over the direction of the wheels due to off tracking. Specifically, the court noted that in making his conclusions, Mr. Ashton assumed that (1) the Petitioner was "actually driving the truck when the victim left it, for which there is no proof"; (2) that the Petitioner had an average male's wingspan when the Petitioner was six feet, four inches tall and weighed 220 pounds; and (3) that the victim jumped from the truck voluntarily as the Petitioner was driving on the exit ramp when he could have forced or coerced her to jump. The court then reasoned as follows:

> In every statement he gave the police[,] his story was that she had never, at any time, even been in his truck. The jury would have had to believe that the victim jumped out of his truck and was killed by accident, but nevertheless, he not only left that scene without seeking any medical help for her, but then knowingly picked up another prostitute, tied her up, threatened her, kidnapped her and drove her hundreds of miles, and that the two events were seemingly unconnected.

Finally, the post-conviction court found that much of Mr. Ashton's testimony "hinged" on measurements he was unable to make because he did not have the actual truck involved in the victim's death. Accordingly, the post-conviction court concluded that the Petitioner failed to demonstrate deficient performance or prejudice.

## II. Analysis

The Petitioner contends that the post-conviction court erred by denying his petition for post-conviction relief because trial counsel was ineffective for failing to hire an accident reconstruction expert, failing to meet with him in jail, advising him not to testify at trial, and "handling" the 404(b) hearing improperly. The Petitioner also

contends that the cumulative effect of trial counsel's errors warrants post-conviction relief. The State argues that the Petitioner has failed to demonstrate that he received the ineffective assistance of counsel. We agree with the State.

To be successful in a claim for post-conviction relief, a petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Further,

[b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

- 13 -

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

Turning to the instant case, we initially note that trial counsel did not testify at the evidentiary hearing to rebut the Petitioner's claims. As this court has repeatedly stated, "We have observed on many occasions that original counsel, when available, should always testify in a post-conviction proceeding when there is an allegation that he was ineffective." State v. Hopson, 589 S.W.2d 952, 954 (Tenn. Crim. App. 1979). Furthermore, "the state should present the attacked counsel to show what occurred." State v. Craven, 656 S.W.2d 872, 873 (Tenn. Crim. App. 1982); Garrett v. State, 530 S.W.2d 98, 99 (Tenn. Crim. App. 1975). Here, the trial court found in its written order denying relief that "[t]he trial lawyer was unavailable by the time the hearing was had on the instant petition, as he had stopped practicing law in Shelby County and had left the State of Tennessee to live close to his son." Additionally, the Petitioner and the State asserted at oral argument that this court could discern trial counsel's strategy from the direct appeal record. Therefore, we turn to the Petitioner's claims.

A. Failure to Have Accident Reconstruction Expert Testify

First, the Petitioner contends that he received the ineffective assistance of counsel because trial counsel failed to hire an accident reconstruction expert to testify at trial. He claims that the expert would have helped his case because the expert could have explained to the jury that he did not reach over and open the passenger door; therefore, the victim must have opened the door and jumped out of the truck. He also contends that the defense could have used the expert's testimony to argue that after she jumped out, he could not see her on the ground, had no control over his rear tires, and did not run over her intentionally. The State argues that the Petitioner failed to demonstrate that counsel was ineffective. We agree with the State.

The State's theory at trial was that the Petitioner either pushed the victim out of the truck or that she jumped out on her own accord because the Petitioner attacked her. However, as noted by the State, the prosecutor never argued to the jury that the Petitioner reached over the victim and opened the passenger door. Therefore, Mr. Ashton's testimony would not have been helpful to the Petitioner in that regard.

Moreover, the State was not required to prove the Petitioner intentionally ran over the victim in order for the jury to convict him of second degree murder, which is the knowing killing of another. See Tenn. Code Ann. § 39-13-201(a). During the prosecutor's closing argument, he pointed that out to the jury, stating, "The next question is why [he killed her]. Was it knowing or intentionally. Doesn't have to be both, it could be either." Even if Mr. Ashton had testified that the Petitioner did not kill the victim intentionally, Mr. Ashton's testimony supported a theory that the Petitioner killed her

- 14 -

knowingly because the Petitioner, a trained professional truck driver, failed to stop and continued turning right after the victim jumped out of his truck when he could not see her on the ground or control the direction in which his rear tires were traveling. Therefore, we conclude that the Petitioner has failed to show that trial counsel was deficient for not having the expert testify at trial or that he was prejudiced by any deficiency.

### B. Failure to Meet with the Petitioner in Jail

Second, the Petitioner contends that trial counsel was deficient for failing to meet with him in jail to discuss his case. He also contends that he was prejudiced by the deficiency because if trial counsel had met with him, trial counsel would have learned that the Petitioner "had a solid defense in this case, i.e., the victim jumped out of his truck and was accidentally run over by the truck's tires," and that trial counsel needed to present an expert to testify about what happened when a tractor trailer made a right turn. The State argues that the Petitioner failed to demonstrate that he is entitled to relief. Again, we agree with the State.

The post-conviction court specifically discredited the Petitioner's testimony that trial counsel failed to meet with him in jail. As stated above, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact" and the post-conviction court's credibility determinations are conclusive on appeal unless the evidence preponderates against them. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The Petitioner initially claimed that he met with trial counsel when trial counsel was appointed and that he did not meet with trial counsel again until jury selection. The Petitioner subsequently acknowledged that he met with trial counsel prior to the Rule 404(b) hearing. Therefore, the evidence does not preponderate against the post-conviction court's credibility determination.

In any event, assuming arguendo that trial counsel failed to meet with the Petitioner in jail so that the Petitioner could tell trial counsel his side of the story, the post-conviction court noted that the trial court held a Momon hearing at trial. During the hearing, defense counsel asked the Petitioner if they had discussed his case and if trial counsel had been able to answer the Petitioner's questions. The Petitioner answered both questions in the affirmative. Additionally, trial counsel argued in his closing argument that the victim was never in the Petitioner's truck. Trial counsel's strategy was based on the Petitioner's pretrial statement to the police that he did not pick up the victim and the fact that no forensic evidence linked the victim to the interior of the truck. Therefore, we conclude that the Petitioner also has failed to demonstrate prejudice.

### C. Advising Petitioner Not to Testify

The Petitioner claims that he received the ineffective assistance of counsel because trial counsel decided to shift the blame for the victim's death to Larico Nelson and advised the Petitioner not to testify at trial. The Petitioner contends that counsel's strategy was "illogical" in light of the proof and that the "best chance of success in this trial was to testify and explain to the jury that the victim's death was an accident that occurred when she jumped out of his truck." The State argues that the Petitioner is not entitled to relief. We agree with the State.

As to the Petitioner's claim that trial counsel's strategy was illogical, trial counsel insinuated through his cross-examination of the witnesses that Mr. Nelson was involved in the victim's death and argued in his closing argument that the victim was never in the Petitioner's truck. The Petitioner told the police that the victim was never in his truck and that the police put her biological material on the trailer. Furthermore, no physical evidence linked the victim to the inside of the truck. Therefore, we cannot say that trial counsel's strategy was unreasonable. In any event, this court may not second-guess the tactical or strategic choices of counsel unless those choices are based upon inadequate preparation, nor may we measure counsel's behavior by "20-20 hindsight." See State v. Hellard, 629 S.W.2d 4, 9 (Tenn. 1982).

The post-conviction court noted that the Petitioner testified at his sentencing hearing and found that the State would have "destroyed" him if he had testified at trial. We have reviewed his testimony. The Petitioner advised the trial court at the sentencing hearing that he wanted to "testify to exactly what happened on December 14th, 2008," and proceeded to give an extensive narrative of his interaction with the victim that morning. In sum, the Petitioner testified that he picked up the victim on Lamar Avenue, drove onto the interstate, and told her that he had a "spot" where they could go for sex. The victim changed her mind about having sex with the Petitioner, so he told her that he would take her back to Lamar Avenue. The Petitioner then stated as follows:

> When I made the wide turn making that right, she jumped. She just jumped out of the truck. But she -- little did she know, the trailer [is] going to always cut in sharper to the turn. And so when that trailer -- when that truck and trailer straightened up by -- that's just mechanical. That's not intentionally. It's mechanical. That's just dynamics. When you making a right turn, the trailer going to cut in sharper to the turn.

> This woman jumped. I ain't force her to jump. I ain't, you know, give her no reason to jump. She stole [my wallet] and she just jumped. And when I finished making my right turn, I never knew that the trailer

caught her, caught at the end and drug her that little feet right there, because my whole [attention] was to the left side of traffic.

And when she jumped, she had no business being in the truck with me, so I just -- you know, when she jumped, I just kept going, you know. And it was on her. That was her choice when she did that.

On cross-examination, the Petitioner often refused to answer yes or no to the State's leading questions and had to be admonished by the trial court. The Petitioner acknowledged that he did not tell the police that the victim stole his wallet or that he accidentally ran over her. Instead, he told the police that he had never met the victim. The State also confronted him with GPS information recorded from his truck, showing that he did not take the route he claimed that day.

The post-conviction court described the Petitioner's testimony as "completely uncontrolled" and found that trial counsel made a "wise" decision in advising the Petitioner not to testify. We conclude that the evidence does not preponderate against the finding of the post-conviction court. Furthermore, the trial court informed the Petitioner of his right to testify and the Petitioner personally waived that right pursuant to Momon v. State, 18 S.W.3d 152, 163 (Tenn. 1999).

The Petitioner contends that we should consider the following factors when determining whether trial counsel was ineffective for failing to call a petitioner to testify at trial:

(1) only the victim and the defendant were present when the offense was committed;

(2) only the defendant could present a "full version of [his] theory of the facts";

(3) the defendant's testimony could not be impeached by prior criminal convictions;

(4) the defendant could give an account of the relationship with the victim; and

(5) the attorney had let in objectionable, prejudicial testimony with the intention of clarifying it with the testimony of the defendant.

State v. Zimmerman, 823 S.W.2d 220, 227 (Tenn. Crim. App. 1991). However, the instant case is quite distinguishable from Zimmerman. In Zimmerman, the defense claimed that the defendant killed her husband in self-defense, and trial counsel promised the jury during his opening statement that the defendant would testify but inexplicably changed his strategy during the trial and did not have the defendant testify. See 823 S.W.2d at 221. The present case is not a self-defense case, and defense counsel did not promise the jury that the Petitioner would testify. Furthermore, trial counsel in the present case did not let in objectionable, prejudicial testimony with the intention of clarifying it with the Petitioner's testimony, and the State could have impeached the Petitioner with his statement to the police, which would have been wholly inconsistent with his trial testimony. Accordingly, we agree with the post-conviction court that the Petitioner is not entitled to relief on this issue.

## D. Handling of 404(b) Hearing

Finally, the Petitioner contends that trial counsel was ineffective in his handling of the 404(b) hearing. Specifically, he contends that trial counsel was deficient by advising him that he did not need to be present at the hearing. He contends that he was prejudiced by the deficiency because if he had been at the hearing, he could have provided trial counsel with "important information" about what he told Carmond Taylor on December 14, 2008; trial counsel then could have used the information to cross-examine Ms. Taylor, and the Petitioner could have testified to rebut her testimony. The State argues that trial counsel made a strategic decision to waive the Petitioner's presence at the hearing. We agree with the State.

The trial court held the Rule 404(b) hearing on April 5, 2012. On the day of the hearing, trial counsel filed a written motion requesting to waive the Petitioner's presence pursuant to Tennessee Rule of Criminal Procedure 43(d)(3), which provides that "[a] defendant need not be present . . . [a]t a conference or argument on a question of law." During the Rule 404(b) hearing, the prosecutor summarized, in the Petitioner's presence, the facts relating to Carmond Taylor and argued that Ms. Taylor should be allowed to testify at the Petitioner's trial to show his intent and lack of mistake in running over the victim. The prosecutor then stated, "We do have [Ms.] Taylor here to testify . . . for the State to establish it by clear and convincing evidence." Trial counsel objected to Ms. Taylor's testifying at trial, arguing that her testimony would be propensity evidence and prejudicial. Trial counsel also advised the trial court that he and the Petitioner did not want the Petitioner to be in the courtroom during Ms. Taylor's hearing testimony because they did not want Ms. Taylor to identify the Petitioner. The trial court addressed the Petitioner and asked, "Is it all right with you, you have a right to be here. Are you giving up your right to be present for this pretrial hearing and agreeing that you be removed

from the courtroom during the hearing?" The Petitioner answered yes and was escorted out of the courtroom.

Initially, we note that the Petitioner was present when the prosecutor advised the trial court that Ms. Taylor was going to testify about what happened on December 14, 2008, belying the Petitioner's claim that he thought the hearing was "like a line up or something" and that he did not know she was going to testify about the "whole event." In any event, the post-conviction court found that trial counsel made a strategic decision to waive the Petitioner's presence at the hearing so that Ms. Taylor could not identify the Petitioner, just two weeks before his trial for running over the victim, as the man who picked up Ms. Taylor and made incriminating statements about running over Ms. Taylor. As stated previously, this court may not second-guess the tactical or strategic choices of counsel unless those choices are based upon inadequate preparation, nor may we measure counsel's behavior by "20-20 hindsight." See Hellard, 629 S.W.2d at 9. Therefore, he is not entitled to relief.

## D. Cumulative Error

Finally, the Petitioner contends that he is entitled to post-conviction relief based upon cumulative error. However, the Petitioner has not shown any error. Accordingly, we find no merit to this claim.

## III. Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the post-conviction court.

_____
NORMA MCGEE OGLE, JUDGE

- 19 -